BILL LOCKYER
Attorney General of the State of California
TOM GREENE
Chief Assistant Attorney General
THEODORA BERGER
Senior Assistant Attorney General
KEN ALEX
Supervising Deputy Attorney General
ROSE B. FUA
TIMOTHY E. SULLIVAN, State Bar No. 197054
Deputy Attorneys General
  1515 Clay Street, 20th Floor
  P.O. Box 70550
  Oakland, CA  94612-0550
  Telephone:  (510) 622-4038
  Fax:  (510) 622-2270
  Email:  Timothy.Sullivan@doj.ca.gov
Attorneys for Plaintiff California Department of Toxic
Substances Control

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL,**<br><br>Plaintiff,<br><br>v.<br><br>**CITY OF CHICO, CALIFORNIA, et al.,**<br><br>Defendants. | Civ.S-02-0442 LKK DAD<br><br>**SETTLEMENT AGREEMENT AND CONSENT DECREE BETWEEN DTSC AND CALIFORNIA WATER SERVICE COMPANY** |

## INTRODUCTION

Plaintiff, the California Department of Toxic Substances Control ("DTSC"), filed an amended complaint on December 3, 2002, (the "Complaint") in the United States District Court for the Eastern District of California (the "Court"), pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq., and California state law governing release of hazardous substances and nuisance.

The Court, on the motion and with the consent of DTSC and California Water Service

Company, Inc. ("Cal Water"), hereby ORDERS, ADJUDGES, AND DECREES as follows:

1. **DEFINITIONS**

    A.    All terms used in this Consent Decree that are defined in section 101 of CERCLA, 42 U.S.C. § 9601, shall have the same meaning set forth in that section.

    B.    "DTSC," as used in this Consent Decree, shall mean DTSC, its predecessors including, but not limited to, the Toxic Substances Control Program of the State of California Department of Health Services, and its successors.

    C.    "Chico Central Plume" means both the soil and groundwater existing in the shallow, intermediate, and/or lower aquifers underlying the city of Chico north of Big Chico Creek that are contaminated with perchloroethylene (including its breakdown products), the area of which is roughly represented by Figure 2-1 of the "Draft Remedial Action Plan, Chico Central Plume, Chico, California" dated March 1, 2006 (attached hereto as Exhibit A and incorporated herein by this reference), and all locations where such contaminants may come to be located.

    D.    "Response Costs," as used in this Consent Decree, shall include all costs of any type or character whatsoever, including but not limited to costs related to "removal," "remedial action," or "response" (as those terms are defined by section 101 of CERCLA), incurred or to be incurred by DTSC in response to the release or threatened release of hazardous substances at, in, or from the Chico Central Plume.  Said term shall include, but not be limited to, direct labor costs; contractor, consultant and expert costs; travel and any other out-of-pocket expenses; the costs of identifying, developing evidence against, and pursuing claims against persons or entities liable for the release or threatened release of hazardous substances at, in, or from the Chico Central Plume; indirect costs; oversight costs; applicable interest charges; and attorneys' fees.

    E.    "Remedial Action Plan," as used in this Consent Decree, shall mean a remedial action plan prepared to address the release or threatened release of hazardous substances at, in, or from the Chico Central Plume and finally approved by DTSC as described in California Health and Safety Code section 25356.1, and also includes any amendments to the remedial action plan that are subsequently approved by DTSC.

F.      "Proposed Remedy" means a remedial action to address contamination at, in, or from the Chico Central Plume composed of the following measures, as set forth in more detail as "Modified Alternative G" in the Draft Remedial Action Plan dated March 1, 2006: (1) The pumping and treatment of water from six wells: three existing wells, known as CMW-101B, CMW-117B, and CWS-21; either existing well CEW-1 or a new well similar in size and location to CEW-1; and two new wells to be installed, known as CMW-118B and CMW-119B; (2) Pumping of water from CWS-8 and, if necessary, treatment; (3) Seasonal pumping of well 45 at the Chico High School; (4) Improvements and modifications to, and continued operation of, the granular activated carbon filtration unit located at the Chico Cemetery (sometimes known as the "Interim Remedial Measure"); (5) Periodic monitoring of groundwater from numerous groundwater monitoring wells previously installed and installation of a new down-gradient monitoring well; and (6) Continuation of the above activities for a period of at least 30 years or until contaminants of concern are no longer detected.

G.      "Remedial Extraction Wells" means the five wells known as CMW-101B, CMW-117B, CEW-1, CMW-118B, and CMW-119B, or any wells constructed to replace those wells.

H.      "Treatment System" means the granular activated carbon filtration unit referred to in the Proposed Remedy intended to remove perchloroethylene from the Remedial Extraction Wells, or any future treatment device that replaces the unit and serves the same purpose in the Remedial Action Plan.  This term does not include treatment devices used to remove contamination from other wells such as CWS-21 and CWS-8.

**2.      <u>RECITALS</u>**

A.      DTSC is the California state agency with primary jurisdiction over the response to the release and threatened release of hazardous substances at, in, or from the Chico Central Plume.

B.      DTSC seeks to recover from all defendants named in the Complaint, including but not limited to Cal Water, jointly and severally, all costs it has incurred in response to releases and/or threatened releases of hazardous substances at, in, or from the Chico Central Plume, pursuant to section 107(a) of CERCLA.  DTSC also seeks a declaratory judgment that all such

1   defendants are jointly and severally liable for all additional costs incurred by DTSC in response

2   to the releases and/or threatened releases of hazardous substances at, in, or from the Chico

3   Central Plume pursuant to section 113(g)(2) of CERCLA, 42 U.S.C. section 9613(g)(2).  DTSC

4   alleges that it will continue to incur Response Costs until the remedy selected in the Remedial

5   Action Plan, and operation and maintenance of that remedy, is completed.  DTSC also seeks

6   injunctive relief to abate a public nuisance (California Health and Safety Code § 58009) and to

7   abate an imminent or substantial endangerment to public health and safety or to the environment

8   (California Health and Safety Code § 25358.3).  DTSC also seeks to enforce administrative

9   orders issued to various defendants, not including Cal Water, for investigation and remediation

10   of the Chico Central Plume (California Health and Safety Code § 25358.3) and seeks damages

11   suffered by DTSC as a result of the failure of certain defendants, not including Cal Water, to

12   properly undertake a removal or remedial action (California Health and Safety Code § 25359).

13        C.     By entering into this Consent Decree, Cal Water expressly denies any liability

14   whatsoever for any of the claims made in the Complaint and under any of the authorities stated in

15   the Complaint, and makes no admission of liability.  DTSC has not contended in this lawsuit that

16   Cal Water was responsible for initially introducing any amount of perchloroethylene or any other

17   contaminant into the groundwater or soils in the Chico Central Plume.  DTSC acknowledges that

18   Cal Water first identified the perchloroethylene problem in the Chico Central Plume pursuant to

19   monitoring required under AB 1803 (ch. 881, Stats. 1983), cooperated with authorities in

20   investigating the problem, and took steps to assist in remediating the perchloroethylene

21   contamination, including taking treated water into its distribution system, allowing others to use

22   its property for staging investigations, and assisting in the operation of  DTSC's Interim

23   Remediation Measure extraction and treatment system.

24        D.     Each of the parties to this Consent Decree represents and acknowledges that, in

25   deciding whether to enter into this Consent Decree, it has not relied on any statement of fact,

26   statement of opinion, or representation, express or implied, made by any other party to this

27   Consent Decree.  Each of the parties to this Consent Decree has investigated the subject matter of

28   this Consent Decree to the extent necessary to make a rational and informed decision to execute

1  it, and has had the opportunity to consult independent counsel.

2      E.     DTSC and Cal Water agree that settlement without further litigation and without

3  the admission or adjudication of any issue of fact or law is the most appropriate means of

4  resolving this action.  This Consent Decree was negotiated and executed by DTSC and Cal Water

5  in good faith to avoid prolonged and complicated litigation.  DTSC and Cal Water, moreover,

6  have negotiated and executed this Consent Decree to further the public interest and to protect

7  human health and the environment.

8  **3.     JURISDICTION**

9      This Court has jurisdiction over DTSC's federal law claims, which arise under CERCLA,

10  pursuant to 28 U.S.C. section 1331 and 42 U.S.C. section 9613(b).  This Court has jurisdiction

11  over DTSC's state law claims under the supplemental jurisdiction provision of 28 U.S.C. section

12  1367(a) and under 28 U.S.C. section 2201, in that the state and federal claims arise from

13  common facts relating to release of hazardous substances and remediation of or failure to

14  remediate the resulting contamination.  This Court has personal jurisdiction over each of the

15  parties to this Consent Decree.  Venue is proper in the Eastern District of California pursuant to

16  28 U.S.C. section 1391(b) and 42 U.S.C. section 9613(b).  This Court, further, has the authority

17  to enter this Consent Decree as a consent decree of the Court.

18  **4.     SETTLEMENT OF DISPUTED CLAIMS**

19      4.1    This Consent Decree represents a fair, reasonable, and equitable settlement of the

20  matters addressed herein.

21      4.2    For the purposes of this Consent Decree, Cal Water admits none of the allegations

22  of the Complaint.  Nothing in this Consent Decree shall be construed as an admission of any

23  issue of law or fact or of any violation of law.  Notwithstanding the foregoing, Cal Water

24  acknowledges that it has agreed to perform certain acts and further acknowledges its

25  responsibility pursuant to this Consent Decree to perform those acts it has agreed to undertake in

26  this Consent Decree, and shall not deny such responsibility in any proceeding brought by DTSC

27  to enforce this Consent Decree.

28      4.3    Except as set forth in section 9 of this Consent Decree, nothing in this Consent

1  Decree shall prejudice, waive, or impair any right, remedy or defense that Cal Water may have in

2  any other or further legal proceeding.

3  **5.      WORK TO BE PERFORMED BY CAL WATER**

4          In exchange for the covenant not to sue contained in this Consent Decree, Cal Water agrees to

5  provide to DTSC the planning, engineering, design, construction, and equipment listed below in

6  sections 5.1, 5.2, 5.3, and 5.4, for the purposes of implementing a remedial action to address

7  releases of hazardous substances.

8          5.0      Recitals

9          5-A      Wells CMW-101B and CMW-117B are extraction wells located in the

10  Chico Central Plume.  The water that is extracted from these wells is contaminated with

11  perchloroethylene.  The extracted water is sent through a granular activated carbon treatment unit

12  to remove the perchloroethylene.  Since 1995, DTSC has operated wells CMW-101B and CMW-

13  117B, and Cal Water has provided the treated water from these wells to its water customers in the

14  city of Chico pursuant to a permit issued by the Department of Health Services ("DHS").  Cal

15  Water currently owns and operates a well known as CWS-21, the water in which has been

16  contaminated with perchloroethylene.  Cal Water treats the water from this well and provides it to

17  its water customers in the city of Chico pursuant to a permit issued by DHS.  Cal Water currently

18  owns and operates a well known as CWS-8 that has shown some level of perchloroethylene

19  contamination, but at concentrations that are below the level at which treatment would be

20  required.  Cal Water provides the water from this well to its water customers in the city of Chico

21  pursuant to a permit issued by the DHS.

22          5-B.      The Proposed Remedy for the Chico Central Plume includes the pumping and

23  treatment of water from six wells: three existing wells, known as CMW-101B, CMW-117B, and

24  CWS-21; either existing well CEW-1 or a new well similar in size and location to CEW-1 designed

25  and installed to take the place of CEW-1 in the Proposed Remedy; and two new wells to be

26  installed, known as CMW-118B and CMW-119B.  A new down-gradient monitoring well is also

27  expected to be installed.  Water will also be pumped from CWS-8 and treated if necessary.

28  Well 45 at the Chico High School is to be pumped seasonally.  When construction of the

1   treatment system is completed, the five Remedial Extraction Wells will be connected to the

2   existing treatment system at the Chico Cemetery; well CWS-21 has its own separate treatment

3   unit; well CWS-8 will have its own separate treatment unit if necessary.  The location of wells

4   CMW-101B, CMW-117B, CEW-1, CWS-21, and CWS-8, and the proposed location of CMW-

5   118B and CMW-119B are shown on Exhibit B.

6           5-C.     As detailed below, Cal Water will retain contractors and design

7   professionals to design and install certain capital improvements included in the Proposed

8   Remedy.  Cal Water will provide for the construction of those specified capital improvements at

9   its expense but subject to a cost cap discussed elsewhere herein.  Any new extraction wells,

10   including CMW-118B and CMW-119B, as well as the new down-gradient monitoring well, are

11   excluded from the capital improvements to be designed and installed by Cal Water, except as

12   otherwise specified in section 5.1(a)(6).  Capital improvements related to site closure are also

13   excluded from the work to be performed by Cal Water.

14           5-D.     As detailed below, Cal Water will provide certain operation and

15   maintenance for the Proposed Remedy at its expense over a 30 year period, or until DTSC has

16   determined that the remediation is complete, whichever is earlier.  Cal Water will provide labor

17   and utilities at its own expense, but parts are excluded.  Cal Water will perform at its own

18   expense influent and effluent EPA standard 8260B or equivalent sampling and analysis once per

19   month, or similar sampling as need to meet DHS monitoring requirements, at each of the

20   Remedial Extraction Wells, the Treatment System, and wells CWS-21 and CWS-8.  Cal Water is

21   not required by this Consent Decree to perform any sampling or analysis of groundwater

22   monitoring wells, including, but not limited to, well purging, sample collection, analytical costs,

23   data analysis, hazardous waste disposal fees, or temporary storage.

24           5-E.     As of the signing of this Consent Decree, DTSC has not approved a final

25   Remedial Action Plan.  The amount, nature, and extent of work to be performed by Cal Water

26   pursuant to this Consent Decree shall not be expanded due to any differences between the

27   Proposed Remedy and the remedy ultimately selected in the approved Remedial Action Plan.

28           5-F.     DTSC installed the granular activated carbon filtration unit located at the

Chico Cemetery (sometimes known as the "Interim Remedial Measure"), which has been operated in part by Cal Water for a number of years, initially pursuant to the terms of a written agreement pertaining to the "Cemetery Wells," although that written agreement has now expired. Except as specifically set forth in this Consent Decree, Cal Water shall hereafter have no responsibility to operate said "Cemetery Wells" or "Interim Remedial Measure."

  5.1. <u>Design and Construction of Remedial Measures</u>.

   (a) Cal Water will hire design professionals and contractors, as necessary, to complete the following elements of the Proposed Remedy (excluding design and construction of CMW-118B, CMW-119B, and the new down-gradient monitoring well, except as otherwise specified in section 5.1(a)(6)), to be defined in the Remedial Design, at its own expense but subject to the Cost Cap described in section 5.1(b) below:

   (1) Planning for new construction necessary to implement the Proposed Remedy as follows:

    (A) Designing pipelines for transmission mains from the Remedial Extraction Wells to the Treatment System and applicable station piping pursuant to the following Cal Water specifications: Specifications for Material (attached hereto as Exhibit C), Specifications for Disinfection of New Mains Based on the Procedures Outlined in the Latest Revision of ANSI/AWWA C651 (attached hereto as Exhibit D), Specifications for the Dechlorination of Flushed Water (attached hereto as Exhibit E), Specifications for Installation of Ductile Iron and Polyvinyl Chloride (PVC) Pressure Pipe and Appurtenances (attached hereto as Exhibit F).

    (B) Coordinating activities among parties conducting work;

    (C) Acquiring use permits, building permits, encroachment permits for work in rights of way, electrical permits, and DHS permit amendments, including preparation and submittal of applications for permits;

    (D) Negotiation of access rights or agreements, if necessary, as an agent on behalf of DTSC when authorized in writing by DTSC to do so.  Consideration, payments, costs or expenses, including attorney's fees, related to the acquisition of real property,

eminent domain, licenses, leases, easements, construction easements, rights of entry or access rights shall not be borne by Cal Water.

        (2)     Designing the Proposed Remedy as follows:

             (A)     Preparing construction drawings for pipeline design;

             (B)     Preparing the electrical design for the operation of pumps and motor transporting water from the Remedial Extraction Wells to the Treatment System;

             (C)     Preparing the concrete pad design to the requirements of the City of Chico Building Department standards,

             (D)     Preparing technical specifications for the pipelines, granular activated carbon units, and all electrical components to operate the fixtures;

             (E)     Selecting equipment for the pump and motors as well as electrical equipment directly in connection with the operation of the mechanical equipment;

             (F)     Preparation of bid packages, including a notice to bidders, newspaper publication (if necessary), special conditions, drawings and/or specifications, a non-collusion affidavit form, bid and/or performance bond forms and the terms and conditions for construction agreements, which shall be exclusively determined by Cal Water;

        (3)     Procuring and installing underground conveyance pipelines between the Treatment System and each of the Remedial Extraction Wells (other than wells CMW-110B and CMW-117B, which already are piped to the Treatment System), including all labor and materials.

        (4)     Providing traffic controls during all phases of construction of pipelines and connections to the Treatment System necessary to implement the Proposed Remedy.

        (5)     Supplying personnel to supervise and coordinate all phases of construction of pipelines and connections to the Treatment System as specified in the Remedial Design.

        (6)     Designing and installing controls for each of the Remedial Extraction Wells so that the wells will shut down when the pressure exceeds Cal Water's normal

1  operating high-pressure limit in the water distribution system and restart when the pressure is

2  below a minimum water system pressure setting.  Cal Water will adjust these pressure settings to

3  give each of the Remedial Extraction Wells the pumping priority that has been assigned to that

4  well pursuant to the procedure in section 5.2(b).

5             (A)    DTSC shall provide, at no cost to Cal Water, control

6  equipment for each of the Remedial Extraction Wells so that the wells will shut down when the

7  pressure exceeds Cal Water's normal operating high-pressure limit in the water distribution

8  system and restart when the pressure is below a minimum water system pressure setting.

9        (b)   <u>Cost Cap</u>

10           (1)    If Cal Water spends more than $1,000,000 (one million dollars) to

11  undertake the actions listed in section 5.1(a), and DTSC determines that additional actions listed

12  in section 5.1(a) are necessary to the success of the Proposed Remedy, DTSC and Cal Water will

13  share the additional expenses equally until the total cost of actions listed in section 5.1(a) reaches

14  $1,500,000, after which time Cal Water will not be responsible for paying for additional actions

15  listed in section 5.1(a).

16           (2)    The $1,000,000 amount described in section 5.1(b)(1) includes the

17  following:  Cal Water's actual expenses for the capital improvements described in Section 5.1(a)

18  plus ten percent (10%) overhead on those capital improvements that are direct, non-contract costs

19  to Cal Water; actual expenses for other materials necessary to implement the actions listed in

20  Section 5.1(a); direct labor costs for time spent undertaking the actions listed in Section 5.1(a);

21  and payments to contractors to implement the actions listed in Section 5.1(a).  The Cost Cap

22  described in this section 5.1(b) applies only to the activities listed in section 5.1(a), and not to

23  other work required of Cal Water by this consent decree.

24           (3)    Until the actions listed in Section 5.1(a) have been completed, Cal

25  Water shall provide monthly statements to DTSC tracking the costs incurred to date for the labor

26  and capital improvements subject to the cap.

27           (4)    Cal Water shall maintain accurate books and records such that the

28  costs incurred by Cal Water in undertaking the actions listed in Section 5.1(a) can be ascertained.

Settlement Agreement & Consent Decree                    Case No. CIV. S-02-0442 LKK DAD

Such books and records shall be maintained at the General Office of Cal Water and shall be available for inspection and copying by DTSC during the normal business day upon ten (10) working days written notice, except as to the year end close.  Copying shall be at expense of DTSC.

(5)     For up to one year after the actions listed in Section 5.1(a) have been completed, DTSC shall have the right at its own expense to have Cal Water's books and records audited by an independent accounting firm or representative, and Cal Water agrees to cooperate fully with DTSC in any such audit.  DTSC shall provide Cal Water forty-five (45) calendar days advance notice of an audit and shall not request an audit during the year end close. DTSC shall also have the right to access records submitted by Cal Water to the California Public Utilities Commission ("CPUC") in connection with its reasonableness review of the costs for the subject capital improvements in the applicable general rate case for the Chico District.

(c)     Cal Water, in its discretion, shall initially determine if actions to be undertaken pursuant to Section 5.1(a) are to be bid competitively, sole source, or otherwise, or are to be performed by Cal Water employees, subject to DTSC's right to review potential contract awards, described below.  Cal Water is not subject to any public works bidding or contract laws by virtue of this Consent Decree.

(1)     Cal Water shall review any bids and make recommendations to DTSC for the award of contracts to perform the work specified in Section 5.1(a).

(2)     If, after completion of the design phase of the work to be undertaken pursuant to Section 5.1(a), Cal Water receives any costs estimates for the remaining actions required by Section 5.1(a), Cal Water will inform DTSC of the dollar amount of such estimates.

(3)      DTSC is entitled to reject a contract award recommended by Cal Water if performance of that contract would cause the cost of any of the actions to be undertaken pursuant to Section 5.1(a) by Cal Water to be greater than the cost of the corresponding items listed in Table 8-1 of the "Draft Remedial Action Plan, Chico Central Plume, Chico, California" dated March 1, 2006 (attached hereto as Exhibit G).

1                (A)     In the event that DTSC rejects a contract award

2 recommendation, DTSC and Cal Water shall meet and confer to determine whether the work

3 proposed in the contract should be solicited again or performed in some other manner.

4                (B)     DTSC's approval of a contract award shall not be

5 unreasonably withheld.  DTSC shall have ten (10) calendar days from receipt to approve or deny

6 a Cal Water contract award recommendation.  DTSC shall consult with Cal Water prior to the

7 denial of any contract award.  Unless DTSC does not approve or otherwise denies a Cal Water

8 contract award recommendation within ten (10) calendar days from receipt of Cal Water's

9 recommendation, Cal Water will deem its contract award recommendation approved and proceed

10 with awarding the contract.

11         (d)     If the level of perchloroethylene in CWS-8 exceeds the Maximum

12 Contaminant Level (currently 5 parts per billion), Cal Water shall construct treatment at CWS-8

13 for 900 gallons per minute (GPM) including the installation of two single-bed 20,000-pound

14 granular activated carbon units meeting Cal Water's standards, or amendments thereto, for the

15 treatment of volatile organic compounds (including perchloroethylene) (attached hereto as

16 Exhibit H).  The proposed plant includes the construction of new electrical equipment, concrete

17 foundations, mechanical pumping equipment, site piping, and the initial fill of carbon filter

18 media meeting Cal Water's carbon specifications, or amendments thereto (attached hereto as

19 Exhibit H).

20         (e)     Cal Water shall not have title to nor ownership interest in the five wells

21 known as CMW-101B, CMW-117B, CEW-1, CMW-118B, CMW-119B, the new down-gradient

22 monitoring well, nor any wells constructed to replace these wells.  Cal Water shall have title to

23 and ownership of the capital improvements installed at its expense and shall retain ownership of

24 CWS-8 and CWS-21.

25         (f)     Except as to CWS-8, CWS-21, Cal Water shall not be responsible for the

26 payment of real property taxes or pump taxes for the Treatment System.  Except as to CWS-8,

27 CWS-21 and the capital improvements constructed by Cal Water at its expense, Cal Water shall

28 not be required to maintain insurance for the Treatment System.

1    (g)    DTSC will give Cal Water the opportunity to review any bids received by

2 DTSC for the construction of any of the Remedial Extraction Wells.  Cal Water will consult

3 with DTSC on design of Remedial Extraction Wells and any equipment needed to be installed

4 on the Treatment System.

5    5.2    <u>Acceptance of Treated Water from the Treatment System</u>.

6    (a)    Cal Water will accept into its distribution system and deliver to its

7 customers the water treated by the Treatment System at its expense for 30 years from the date

8 that this Consent Decree is approved by the Court or for as long as DTSC determines that the

9 Treatment System should continue to operate, whichever is shorter.  The quantity of water

10 anticipated but not guaranteed to be produced by the Treatment System is 750-1,000 gallons per

11 minute, depending upon system conditions and maintenance.  However, Cal Water shall be

12 relieved of this requirement for any period of time during which a regulatory agency of the State

13 or federal government does not permit Cal Water to provide the treated pumped water (alone or

14 blended with other water) to its domestic water customers, provided that such prohibition is not

15 a result of Cal Water's failure, without substantial justification, to comply with a permit issued

16 to it.

17    (b)    Cal Water will use its best efforts to continuously (24 hours per day)

18 pump the Remedial Extraction Wells, CWS-21, and CWS-8 (if necessary, as per section

19 5.4(a)(1)) at the rates specified in the Remedial Action Plan.  Cal Water will manage its

20 pumping and distribution of water in order to give priority to continuous pumping of the

21 Remedial Extraction Wells, CWS-21, and CWS-8 (if necessary) over all other Cal Water wells

22 in Chico such that Cal Water will stop pumping other Cal Water wells in Chico so that the

23 specified wells can continue to pump without exceeding the pressure limits of the distribution

24 system.  These pumping requirements are subject to the following:

25    (1)    Cal Water will be allowed to shut down wells in case of

26 emergency or when necessary to perform routine maintenance, inspections, and repairs.

27    (2)    Cal Water may pump any Cal Water wells in Chico in

28 contravention of the priority established in section 5.2(b) if such pumping is needed to maintain

1  system pressure to meet customer demand or regulatory requirements.

2          (3)     Cal Water may pump wells CWS-16 and CWS-46 in

3  contravention of the priority established in section 5.2(b).

4          (4)     No more than once per year, DTSC will inform Cal Water in

5  writing of the pumping priority among each of the Remedial Extraction Wells, CWS-21, and

6  CWS-8 (if necessary).  If at any time water distribution system pressure limits do not allow the

7  Remedial Extraction Wells, CWS-21, and CWS-8 (if necessary) to all be pumped

8  simultaneously, Cal Water may stop pumping one or more of these wells in the priority order

9  specified by DTSC until such time as system pressure allows one or more of these wells to

10  resume pumping.

11        (c)     DTSC, at its expense, shall equip each of the Remedial Extraction Wells

12  with a chart recorder that will record flow rate and water system pressure.  DTSC, at its expense,

13  shall equip the Remedial Extraction Wells with a totalizing flow meter.  Cal Water shall report

14  to DTSC each month the monthly total output of each of the Remedial Extraction Wells, CWS-

15  21, and CWS-8.

16        (d)     Under no circumstances is Cal Water required to manage the treated

17  water at its expense in a manner other than by delivering water to its customers.

18        (e)     Cal Water is not required to pay any user fees for the acceptance of the

19  treated water from the Remedial Extraction Wells during the time that it is providing at its own

20  expense the services described in section 5.3.

21        (f)     Cal Water shall use its best efforts to obtain from DHS or any other

22  applicable regulatory agency a permit allowing it to deliver the treated water from the Treatment

23  System to its customers.  These efforts shall include collecting and providing necessary data,

24  preparing application documents, supplying maps and diagrams, responding to inquiries from

25  regulators, and implementing at its expense the 12-step process set forth in the DHS letter of

26  February 17, 2006, to Cal Water.  (The letter and DHS's "Policy Memo 97-005 Policy Guidance

27  for Direct Domestic Use of Extremely Impaired Sources" are attached hereto as Exhibit I.)  Cal

28  Water shall not be responsible for the costs, including attorney's fees and engineering or

environmental consultant's fees, associated with the preparation and approval of an environmental impact report (EIR), if required for the Treatment System and/or the Remedial Extraction Wells.

        (1)    Denial or revocation of a permit by DHS or any other applicable regulatory agency that results in the inability of Cal Water to legally provide the treated water to its domestic water customers shall not constitute a violation of this Consent Decree, unless the denial or revocation is due to Cal Water's failure, without substantial justification, to comply with the procedural requirements of or requests for information from the regulatory agency.  Cal Water shall have a reasonable opportunity to cure said denial or revocation after written notice thereof before it is deemed a violation of this Consent Decree.

    (g)    Cal Water shall remain in compliance with all applicable statutes, regulations, and permits, including permits issued by DHS, which allow it to deliver treated water from the Treatment System to its domestic water customers.

    5.3    <u>Ongoing Operations and Maintenance of the Treatment System</u>.

    Starting on the day that this Consent Decree is entered as an order of the Court and ending on the day 30 years subsequent thereto, or when DTSC has determined that the remediation is complete, whichever is earlier, Cal Water will, at its expense, perform the work specified below to operate and maintain the Treatment System, Remedial Extraction Wells, and associated equipment and pipelines:

        (a)    Pump the Remedial Extraction Wells as described in section 5.2.  Costs to be borne by CWS are as follows:

        (1)    Power used to pump the Remedial Extraction Wells and operate the Treatment System;

        (2)    Other utilities, such as telephone, necessary for the operation of the Remedial Extraction Wells and Treatment System;

        (b)    Cal Water shall maintain the Remedial Extraction Wells.  Maintenance includes leak repair, adjustment and repair of pump lubrication equipment and flow meter equipment, chart replacement, site inspection, and other maintenance necessary for operation of

1  pumps, motors, and electrical equipment, as Cal Water determines is needed.

2          (1)     Cal Water shall not be responsible for the cost of replacement

3  parts for the Remedial Extraction Wells, provided that the need to replace said parts is from

4  causes beyond the reasonable control of Cal Water, due to normal wear and tear, or end of

5  expected useful life.

6          (2)     Cal Water shall not be responsible for the cost of disposing of raw

7  water from the Remedial Extraction Wells that cannot be conveyed to the Treatment System.

8          (c)     Cal Water shall perform maintenance of the Treatment System.

9  Maintenance includes leak repair, adjustment and repair of equipment, chart replacement, site

10  inspection, pre-filter replacement, coordination and supervision of replacement of carbon filter

11  media, and other maintenance necessary for operation of the Treatment System, as Cal Water

12  determines is needed.

13          (1)     Cal Water shall not be responsible for the cost of replacement parts

14  for the Treatment System, provided that the need to replace said parts is from causes beyond the

15  reasonable control of Cal Water, due to normal wear and tear or end of expected useful life.

16          (2)     Cal Water shall not be responsible for the cost of carbon filter

17  media used to treat water passing through the Treatment System, nor disposal of such media.  If

18  the selected treatment technology changes, Cal Water likewise shall not be responsible for costs

19  of replacements parts for the new technology.

20          (d)     Cal Water shall apply for and obtain any permits or permit amendments

21  or renewals necessary for the continued operation of the Treatment System and Remedial

22  Extraction Wells, including paying any permitting or regulatory fees necessary for the legal

23  operation of the Treatment System and Remedial Extraction Wells.  Cal Water shall not be

24  responsible for the costs, including attorney's fees and engineering or environmental

25  consultant's fees, associated with the preparation and approval of an environmental impact

26  report (EIR), if required for the Treatment System and/or the Remedial Extraction Wells.

27          (e)     Cal Water shall remain in compliance with all applicable statutes,

28  regulations, and permits, including permits issued by DHS, with respect to the work to be

1    performed pursuant to Section 5.3.

2          (f)    Cal Water will perform at its expense sampling and analysis, using method

3    EPA standard 8260B or equivalent, once per month, or similar sampling as need to meet DHS

4    monitoring requirements, of water extracted and treated as part of the Proposed Remedy, and

5    report those results to DTSC on a monthly basis.  Changes to the monitoring protocols may be

6    made with the prior written approval of DTSC.  The water to be sampled is as follows:

7          (1)    Water that has been treated by one of the granular activated carbon

8    units at the Treatment System prior to entry of that water into the second granular activated

9    carbon unit at the Treatment System;

10         (2)    Treated water that exits the Treatment System after passing

11   through both granular activated carbon units;

12         (3)    Raw, untreated water extracted from each of the five Remedial

13   Extraction Wells.

14         (g)    Cal Water is not responsible for the cost of any sampling or analysis of

15   groundwater monitoring wells, including, but not limited to, well purging, sample collection,

16   analytical costs, data analysis, hazardous waste disposal fees, or temporary storage.

17         (h)    Cal Water shall make reasonable efforts to obtain access to the Remedial

18   Extraction Wells and Treatment System and associated equipment and pipelines necessary to

19   carry out the activities described in this section 5.3.  Consideration, payments, costs or expenses,

20   including attorney's fees, related to the acquisition of real property, eminent domain, licenses,

21   leases, easements, construction easements, rights of entry or access rights shall not be borne by

22   Cal Water.

23       5.4    <u>Operation of Wells CWS-21 and CWS-8</u>.

24       Cal Water shall operate at its expense CWS-21 and CWS-8 (if necessary) for 30 years or

25   until DTSC has determined that the clean-up performance goals specified in the Remedial Action

26   Plan have been achieved, whichever is earlier.

27         (a)    In operating the well(s) Cal Water will perform, at its expense, the

28   following activities:

(1)     Pump CWS-21 and CWS-8 (if necessary).  Subject to the limitations described in section 5.2(b), Cal Water shall pump well CWS-21 as near to continuously as possible.  Subject to the limitations described in section 5.2(b), Cal Water shall pump CWS-8 at its historical rate and frequency, until such time as CWS-8 exceeds the Maximum Contaminant Level for perchloroethylene, after which time it will be pumped as near to continuously as possible, provided that water from CWS-8 may be legally accepted into Cal Water's distribution system.

(2)     Accept into its distribution system and deliver to its customers the pumped water at its expense.  Cal Water shall be relieved of this requirement for any period of time during which a regulatory agency of the State or federal government prohibits CWS from providing the pumped water to its domestic water customers, provided that such prohibition is not a result of Cal Water's failure, without substantial justification, to comply with a permit issued to it or failure to use available cost-effective technology to remove contaminants from the water pumped by the well(s).

(3)     Monitor water extracted from wells CWS-21 and CWS-8 (if necessary) by collecting influent and effluent samples each month, analyzing them for volatile organic compounds, and reporting the results of such analyses to DTSC monthly.  Changes to the monitoring protocols may be made with the prior written approval of DTSC.

(4)     Apply for and obtain any permits, permit amendments or renewals necessary for the continued operation of wells CWS-21 and CWS-8, including paying any permitting or regulatory fees necessary for the legal operation of these wells, and remain in compliance with all applicable regulations and permits, including permits issued by DHS, with respect to the work to be performed pursuant to this Section 5.4.

(A)     Denial or revocation of a permit by DHS or any other applicable regulatory agency that results in the inability of Cal Water to legally provide the treated water from CWS-21 or CWS-8 to its domestic water customers shall constitute a violation of this Consent Decree, if and only if the denial or revocation is due to Cal Water's failure, without substantial justification, to comply with the procedural requirements of or

1  requests for information from the regulatory agency.  Cal Water shall have a reasonable

2  opportunity to cure said denial or revocation after written notice thereof before it is deemed a

3  violation of this Consent Decree.

4          (5)     Perform maintenance of wells CWS-21 and CWS-8 and associated

5  equipment and pipelines, including providing and installing replacement parts and replacing

6  carbon or other water treatment media.

7          (b)     If Cal Water determines that it is technically infeasible to operate either CWS-

8  21 or CWS-8 due to the physical condition of the well boring or casing or due to geological

9  conditions, the following procedures shall apply:

10          (1)     Cal Water shall meet and confer with DTSC about the condition of

11  the well, potential remedies to correct the condition causing the technical infeasibility, and whether

12  operation of the well is needed to achieve the goals of the Remedial Action Plan.

13          (2)     If DTSC determines that operation of the well is still needed to

14  achieve the goals of the Remedial Action Plan, then DTSC may choose one or more of the following

15  actions:

16              (A)     Cal Water will rehabilitate the well at its own expense if

17  rehabilitation is technically reasonable.

18              (B)     Cal Water will install a replacement well at its own expense to

19  take the place of the well to be taken out of service if the replacement well can be installed on the

20  same piece of property as the well to be taken out of service.

21              (C)     Cal Water will install a replacement well at its own expense to

22  take the place of the well to be taken out of service on a parcel of land obtained by DTSC if the

23  replacement well cannot be installed on the same piece of property as the well to be taken out of

24  service.

25          (3)     Cal Water is not obligated by this Consent Decree to acquire any real

26  property, by payment of consideration or through the exercise of eminent domain, for the purpose of

27  installing a well to replace CWS-21 or CWS-8.  Cal Water is not obligated by this Consent Decree to

28  re-install a well more than one time nor to rehabilitate a well more than one time.

1    (c) If contaminants other than PCE are detected in CWS-8 or treatment

2    technology changes such that it is technically infeasible for Cal Water to operate CWS-8 solely with

3    the granular activated carbon adsorption described in section 5.1(d), the following procedures shall

4    apply:

5    (1) Cal Water shall meet and confer with DTSC about the contaminant

6    levels in the well, potential treatment technologies, and whether operation of the well is needed to

7    achieve the goals of the Remedial Action Plan.

8    (2) If DTSC determines that operation of the well is still needed to

9    achieve the goals of the Remedial Action Plan, then DTSC has the option of providing treatment

10   technology for the well, at no expense to Cal Water, such that the well can continue to operate legally.

11   (3) Cal Water is not obligated by this Consent Decree to install treatment

12   technology on CWS-8 other than that described in section 5.1(d).

13   (d) Cal Water shall operate any well installed to replace either CWS-21 or CWS-

14   8 according to terms of this Consent Decree applicable to the original well.

15   (e) If for any reason CWS-21 or CWS-8 becomes permanently inoperable, Cal

16   Water shall immediately decommission the well pursuant to a work plan submitted to and approved

17   by DTSC.  Notwithstanding the foregoing, Cal Water may take CWS-8 and/or CWS-21 off-line

18   for repairs, rehabilitation, maintenance, peaking or due to system conditions described in section

19   5.2(b).

20   (f) Other than as specified in this section 5.4, nothing in this Consent Decree

21   obligates DTSC to pay for or reimburse Cal Water for the activities listed in section 5.4.

22   5.5 Cal Water shall conduct all activities required by this Consent Decree in

23   compliance with all applicable state, local and federal requirements including, but not limited to,

24   requirements to obtain permits and to assure worker safety as set forth above.  Cal Water shall

25   also comply with all applicable or relevant and appropriate requirements of all Federal and state

26   environmental laws to be set forth in Remedial Action Plan.  The activities conducted by Cal

27   Water pursuant to this Consent Decree, if consistent with a Remedial Action Plan approved by

28

DTSC, shall be considered to be consistent with California Health and Safety Code section 25356.1.5.

5.6     If the Remedial Action Plan states that activities being performed or to be performed by Cal Water pursuant to any portions of section 5 are inconsistent with the selected remedy for the Chico Central Plume, then Cal Water shall not be required by this Consent Decree to perform those activities that the Remedial Action Plan explicitly identifies and states are inconsistent with the remedy selected by the Remedial Action Plan.

5.7     The conveyance by Cal Water of any interest in property, including but not limited to pipelines, pumping equipment, or treatment facilities, shall not release or otherwise affect Cal Water's responsibilities to perform the work specified in section 5, except that:

(a)     If at any time Cal Water is no longer the public water purveyor for the city of Chico, Cal Water may arrange with the successor water purveyor for the city of Chico, or, subject to DTSC approval, with another entity of its choosing, to complete the obligations of Cal Water to perform work under the terms of this Consent Decree; and

(b)     If, as a result of an exercise of eminent domain by a public entity, Cal Water property necessary for complying with the terms of this Consent Decree, including but not limited to pipelines, pumping equipment, or treatment facilities, is condemned and no longer in Cal Water's possession, then Cal Water's responsibilities, if any, to perform the work specified in section 5 will be based on applicable eminent domain law at the time of condemnation.

5.8     Unless otherwise specified, nothing in this Consent Decree obligates DTSC to pay for or reimburse Cal Water for any of the activities listed in section 5.  Nothing in this Consent Decree prohibits or in any way limits Cal Water from seeking and obtaining reimbursement for any of the activities listed in section 5, except from DTSC.

5.9     If requested by Cal Water with reasonable notice, DTSC will provide information or testimony to the California Public Utilities Commission to explain the nature and necessity of the work being performed by Cal Water pursuant to this Consent Decree.

1    5.10    Cal Water shall not be held liable or deemed to have breached this Consent

2    Decree for failure or delay caused by or resulting from causes beyond its reasonable control,

3    including, but not limited to, fire, floods or other extreme weather conditions, earthquakes, acts

4    of terrorism, acts of war, civil disturbances, acts of God, labor disturbances, embargoes, or delays

5    in acting by any governmental authority.

6           (a)    Cal Water shall not be held responsible for removing such failures or

7    delays unless:

8                  (1)    The failures or delays result from causes within Cal Water's

9    control; or

10                 (2)    The failures or delays affect property owned by Cal Water, but only

11   to the extent the failures or delays affect such property.

12          (b)    This paragraph is intended only to suspend and not discharge obligations

13   under this Consent Decree.  When the causes of the failure or delay are removed, performance

14   shall resume by Cal Water.

15   5.11    Within 10 days of the effective date of this Consent Decree, Cal Water and DTSC

16   shall each designate an individual to serve as a contact and liaison for the work described in

17   section 5.

18   **6.    GOVERNMENT LIABILITIES**

19          Neither DTSC nor any other department or agency of the State of California shall be

20   liable for any injuries or damages to persons or property resulting from acts or omissions by Cal

21   Water in carrying out activities pursuant to this Consent Decree.  Neither DTSC nor any other

22   department or agency of the State of California shall be held as a party to any contract entered

23   into by Cal Water or its agents in carrying out activities pursuant to this Consent Decree unless

24   the contract is entered into in writing by DTSC or such other department or agency of the State of

25   California.

26   **7.    COVENANT NOT TO SUE BY DTSC**

27          7.1    Except as specifically provided in sections 7.2 and 8, below, and except as may be

28   necessary to enforce the terms of this Consent Decree, as of the date this Consent Decree is

entered as a consent decree of the Court, DTSC covenants not to sue Cal Water for "Matters Addressed" by this Consent Decree.  "Matters Addressed" includes any and all civil liability for reimbursement of all or any portion of DTSC's Response Costs, past or future, declaratory relief, injunctive relief or any other relief under CERCLA, the Carpenter-Presley-Tanner Hazardous Substance Account Act, California Health & Safety Code §§ 25300 et seq., or any other applicable federal or state statutory or common law for liability for Response Costs and/or response actions, with regard to releases or threatened releases of perchloroethylene (including its breakdown products) at, in, or from the Chico Central Plume, as set forth in the Complaint.

7.2    "Matters Addressed" shall not include, and the covenant not to sue set forth in section 7.1 above does not pertain to, any matters other than those expressly specified in section 7.1.  DTSC reserves, and this Consent Decree is without prejudice to, all rights, claims and causes of action DTSC may have against Cal Water with respect to all other matters, including releases or threatened releases of hazardous substances in the city of Chico other than releases or threatened releases of perchloroethylene (including its breakdown products) at, in, or from the Chico Central Plume.

7.3    DTSC further covenants not to sue Cal Water for reimbursement of all or any portion of DTSC's Response Costs, past or future, declaratory relief, injunctive relief or any other relief under CERCLA, the Carpenter-Presley-Tanner Hazardous Substance Account Act, California Health & Safety Code §§ 25300 et seq., or any other applicable federal or state statutory or common law for liability for Response Costs and/or response actions with respect to work being performed by Cal Water in compliance with this Consent Decree, including but not limited to the pumping or not pumping of wells CWS-21 and/or CWS-8 (or other wells that replace said wells) done in compliance with this Consent Decree.

**8.    RESERVATION OF RIGHTS**

8.1    The Covenant Not to Sue set forth in section 7.1 above does not pertain to the following matters, which DTSC reserves, and this Consent Decree is without prejudice to all rights and claims of DTSC against Cal Water with respect to the following:

1    (a)    material failure of Cal Water to meet the requirements of this Consent

2 Decree;

3    (b)    damage to natural resources, as defined in Section 101(6) of CERCLA, 42

4 U.S.C. section 9601(6), including all costs incurred by any natural resources trustees; and

5    (c)    criminal liability.

6    8.2    Except as expressly provided in this Consent Decree, nothing in this Consent

7 Decree is intended nor shall it be construed to preclude DTSC from exercising its authority under

8 any law, statute or regulation.  Furthermore, nothing in this Consent Decree is intended, nor shall

9 it be construed, to preclude any other state agency, department, board or entity or any federal

10 entity from exercising its authority under any law, statute or regulation.

11 **9.    COVENANT NOT TO SUE BY CAL WATER**

12    9.1    Cal Water covenants not to sue, and agrees not to assert any claims or causes of

13 action against, DTSC, or its contractors or employees, for any costs or damages Cal Water might

14 incur or for any injuries or losses Cal Water might suffer as a result of its performance of the

15 requirements of this Consent Decree.

16    9.2    Cal Water further covenants not to sue, and agrees not to assert any claims or

17 causes of action (including those previously identified in any counterclaims filed by Cal Water)

18 under CERCLA, the Carpenter-Presley-Tanner Hazardous Substance Account Act, California

19 Health & Safety Code §§ 25300 et seq., or any other applicable federal or state statutory or

20 common law, against, DTSC or its contractors or employees, arising from any costs Cal Water

21 has incurred, or may incur in the future, conducting removal or remedial activities, including

22 operation and maintenance activities, at and for the Chico Central Plume.

23    9.3    Nothing in this section 9 prohibits Cal Water from taking such action as is

24 necessary to enforce the provisions, terms, or conditions of this Consent Decree.

25 **10.    EFFECT OF CONSENT DECREE**

26    10.1    This Consent Decree constitutes the resolution of Cal Water's liability to DTSC

27 with respect to the Matters Addressed in a judicially approved settlement within the meaning of

28 section 113(f)(2) of CERCLA, 42 U.S.C. section 9613(f)(2).  This Consent Decree requires Cal

1  Water to perform various activities in connection with the remediation of the hazardous

2  substances released at, in, or from the Chico Central Plume.

3        10.2    Accordingly, upon entry of this Consent Decree as a consent decree of the Court,

4  and provided that Cal Water performs all of its obligations under this Consent Decree, Cal Water

5  shall be entitled, as of the date this Consent Decree is entered as a consent decree of the Court, to

6  protection against all claims for contribution, pursuant to section 113(f)(2) of CERCLA, 42

7  U.S.C. section 9613(f)(2), for the Matters Addressed by this Consent Decree (as described in

8  section 7), to the fullest extent permitted by law, and by entering this Consent Decree this Court

9  makes a determination pursuant to California Code of Civil Procedure section 877.6 that the

10  settlement was made in good faith and shall bar any other joint tortfeasor or co-obligor from any

11  further claims against the settling tortfeasor or co-obligor (Cal Water) for equitable comparative

12  contribution, or partial or comparative indemnity, based on comparative negligence or

13  comparative fault.

14        10.3    Except as specifically provided in this Consent Decree, nothing in this Consent

15  Decree is intended, nor shall be construed, to waive, release, or otherwise affect any right, claim,

16  or cause of action held by any party to this Consent Decree against, or to provide a covenant not

17  to sue to, any third person not a party to this Consent Decree, or to in any way limit, restrict, or

18  impair the right of any party to this Consent Decree to assert rights, claims, causes of actions, and

19  defenses against any third person not a party to this Consent Decree, including without limitation,

20  the right to seek payment, reimbursement, contribution, or indemnity from such persons for

21  obligations incurred or to be incurred, or actions taken or to be taken, under this Consent Decree.

22  Except as specifically provided in this Consent Decree, DTSC and Cal Water expressly reserve

23  any rights, claims, or causes of actions they might have against any third person not a party to

24  this Consent Decree.

25        10.4    This Consent Decree is contingent and dependent on all of its terms being

26  approved and ordered by the Court.  If the Court does not approve and order this Consent Decree,

27  DTSC and Cal Water reserve all of their respective rights, remedies, and defenses.

28        10.5    This Consent Decree is not intended, nor shall it be construed, to limit or

1   otherwise affect DTSC's right to select a remedial action for the Chico Central Plume that is

2   different from or inconsistent with the Proposed Remedy.

3        10.6    By agreeing to the terms of this Consent Decree, including but not limited to the

4   statement of work to be performed by Cal Water, Cal Water does not warrant, promise, represent

5   or guarantee that any of the actions taken by Cal Water will remediate or have any effect upon

6   contamination in the Central Plume.

7        10.7    Nothing in this Consent Decree obligates DTSC to perform, implement, or pay for

8   any work specified in the Remedial Action Plan or included in the definition of the Proposed

9   Remedy, to clean up or remediate contaminated groundwater, or to provide treated or

10  uncontaminated water to Cal Water.  This Consent Decree does not create a cause of action

11  against DTSC for any failure by DTSC to perform, implement, or pay for any work specified in

12  the Remedial Action Plan or included in the definition of the Proposed Remedy, to clean up or

13  remediate contaminated groundwater, or to provide treated or uncontaminated water to Cal

14  Water.

15  **11.      RETENTION OF RECORDS**

16       11.1    Cal Water shall provide to DTSC, upon request, copies of all documents and

17  information within its possession or control or that of their contractors or agents relating to the

18  implementation of this Consent Decree, including, but not limited to design specifications,

19  reports of construction activities, contracts, invoices, sampling, analysis, chain of custody

20  records, manifests, trucking logs, receipts, reports, sample traffic routing, and correspondence.

21  Such records shall be preserved by Cal Water until 10 years after the entry of this Consent

22  Decree, or 10 years after creation of a record or document, whichever is later.

23       11.2    Cal Water may assert that certain documents, records, and other information

24  requested by DTSC under section 11.1 are privileged under the attorney-client privilege or any

25  other privilege recognized by law.  If Cal Water asserts such a privilege, it shall provide DTSC

26  with the following: (1) the title of the document, record, or information; (2) the date of the

27  document, record, or information; (3) the name and title of the author of the document, record, or

28  information; (4) the name and title of each addressee and recipient of the document, record, or

information; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by Cal Water.  However, no documents, records, or other information created or generated pursuant to the requirements of the Consent Decree shall be withheld on the grounds that they are privileged.  If a claim of privilege applies only to a portion of a document, the document shall be provided to DTSC in redacted form to mask the privileged information only. Cal Water shall retain all records and documents it claims to be privileged until DTSC has had a reasonable opportunity to dispute the privilege claim and any such dispute has been resolved in Cal Water's favor.

11.3    DTSC shall retain records relating to the implementation of this Consent Decree in accordance with the requirements of the State Records Management Act (California Government Code, §§ 14740-14774) and related implementing regulations and policies.  DTSC shall make such records available to Cal Water upon request in accordance with the terms of the California Public Records Act (California Government Code, §§ 6250 et seq.).

**12.    <u>NOTIFICATION</u>**

12.1.    Notification to or communication between the parties to this Consent Decree as required or provided for in this Consent Decree shall be addressed as follows (except that monitoring data required to be sent to DTSC pursuant to section 5 shall be sent only to Mr. Tjosvold):

As to DTSC:

James Tjosvold
Chief, Northern California Central Cleanup Operations Branch
Department of Toxic Substances Control
8800 Cal Center Drive
Sacramento, CA 95826-3200
Attn: Donald Mandel, Project Manager for Chico Central Plume
facsimile: (916) 255-3696

Steve Koyasako, Esq.
Office of Legal Counsel
Department of Toxic Substances Control
1001 "I" Street
P.O. Box 806
Sacramento, CA 95812
facsimile: (916) 323-5542

1   Timothy E. Sullivan, Esq.
    Deputy Attorney General
2   California Department of Justice
    1515 Clay Street, 20th Floor
3   P.O. Box 70550
    Oakland, CA 94612-0550
4   facsimile: (510) 622-2270

5       As to Cal Water:

6       Lynne McGhee
        Corporate Counsel
7       California Water Service Company, Inc.
        1720 North First Street
8       San Jose, CA.  95112-4598
        facsimile:
9
        Patrick D. Riddle
10      Paul D. Sheldon
        Law Offices of Patrick D. Riddle
11      1811 Grand Canal Blvd., Suite 2
        Stockton, CA 95207
12      facsimile: (209) 367-6997

13      12.2.   Upon 10 days notice to the other party, a party to this Consent Decree may

14   substitute another person for an addressee named above to receive notifications or

15   communications as required or provided for in this Consent Decree.

16   **13.    MODIFICATION OF SETTLEMENT AGREEMENT AND CONSENT DECREE**

17      This Consent Decree may only be modified upon the written agreement of DTSC and Cal

18   Water and the approval of the Court, or upon order of the Court after noticed motion by a party to

19   this Consent Decree.

20   **14.    APPLICATION OF CONSENT DECREE**

21      This Consent Decree shall apply to and be binding upon DTSC, Cal Water, and each of

22   their respective successors and assigns.  The provisions of this Consent Decree shall inure to the

23   benefit of DTSC, Cal Water, and each of their respective successors and assigns.  The provisions

24   of this Consent Decree shall also inure to the benefit of the officers, directors, employees and

25   agents, attorneys, and affiliates of Cal Water, in their capacities as such, and to Cal Water's

26   parent and subsidiary companies, including but not limited to California Water Service Group.

27   **15.    AUTHORITY TO ENTER**

28      Each signatory to this Consent Decree certifies that he or she is fully authorized by the

Settlement Agreement & Consent Decree                          Case No. CIV. S-02-0442 LKK DAD

party he or she represents to enter into this Consent Decree, to execute it on behalf of the party represented, and legally to bind that party.

**16.   INTEGRATION**

This Consent Decree, including the exhibits and other materials incorporated herein by reference, constitutes the entire agreement between DTSC and Cal Water and may not be amended or supplemented except as provided for in this Consent Decree.

**17.   RETENTION OF JURISDICTION**

The Court shall retain jurisdiction of this matter for the purpose of enforcing the terms of this Consent Decree.

**18.   EXECUTION OF DECREE**

This Consent Decree may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**19.   INTERPRETATION**

California law governs the interpretation of this Consent Decree.  This Consent Decree shall be deemed to have been drafted equally by all parties hereto.

**20.   DISPUTE RESOLUTION**

20.1   The dispute resolution process described in this section is limited to disputes relating to the scope, nature, or duration of work to be performed by Cal Water or DTSC pursuant to the Consent Decree.

20.2   DTSC and Cal Water agree that they will make good faith efforts to informally resolve any disputes as to the scope, nature, or duration of work to be performed by Cal Water pursuant to the Consent Decree.  Such efforts shall include written or oral communications between employees of Cal Water and DTSC to discuss the nature of the dispute and means of resolving the dispute.

20.3   If a dispute remains after informal attempts at resolution, DTSC or Cal Water may request to the other party in writing that the parties employ a mediator to help resolve the dispute. Mediation is not required by this Consent Decree and must be agreed upon by both parties.  The role of the mediator will be solely to facilitate discussions and help the parties resolve the dispute

on terms agreeable to both parties. The mediator will not have the power to issue rulings on the meaning of the Consent Decree nor to make decisions binding on the parties. DTSC and Cal Water will share equally in the cost of the mediation, and each party shall pay its own fees and costs. DTSC and Cal Water agree that the mediation described in this section shall be conducted by Martin Quinn, or by such other person as both parties agree upon.

20.4     Any dispute not resolved through the dispute resolution process described in this section may be raised to the U.S. District Court for the Eastern District of California for resolution.

20.5     Notwithstanding the invocation of the dispute resolution procedures set forth in this section, Cal Water shall continue to perform all of its obligations under this Consent Decree that are not substantially in dispute or at issue.

**21.     ATTORNEYS FEES AND COSTS**

As to each other, each party to this Consent Decree shall bear its own costs, attorneys' fees, expert witness fees, and all other costs of litigation. This paragraph shall have no effect on the parties' right to recover these fees or costs from any other party.

**22.     APPROVALS OF PARTIES**

Plaintiff DTSC consents to this Consent Decree by its authorized representative as follows:

CALIFORNIA DEPARTMENT OF
TOXIC SUBSTANCES CONTROL

Dated: 10/23/06                          /s/

James Tjosvold
Chief, Northern California-Central Cleanup
  Operations Branch
California Department of Toxic Substances Control

///

///

///

///

///

1      Cal Water consents to this Consent Decree by its authorized representative as follows:

2                                              CALIFORNIA WATER SERVICE COMPANY,
                                                 INC.
3

4   Dated: 11/3/06                  By:      /s/_____

5
                                             Its:
6

7   Dated: 11/3/06                  By:      /s/_____

8
                                             Its:
9

10  APPROVED AS TO FORM:

11
    DATED: 10/23/06
12                                           BILL LOCKYER, Attorney General
                                               of the State of California
13                                           THEODORA BERGER
                                             Senior Assistant Attorney General
14                                           ROSE B. FUA
                                             Deputy Attorney General
15

16                                            /s/_____
                                             TIMOTHY E. SULLIVAN
17                                           Deputy Attorney General
                                             Attorneys for Plaintiff
18                                           CALIFORNIA DEPARTMENT OF TOXIC
                                             SUBSTANCES CONTROL
19

20  DATED: 11/7/06
                                             LAW OFFICES OF PATRICK D. RIDDLE
21

22                                            /s/_____
                                             PAUL D. SHELDON
23                                           Attorneys for Defendant
                                             CALIFORNIA WATER SERVICE COMPANY
24

25  **IT IS SO ORDERED, ADJUDGED AND DECREED:**

26

27  Dated:     May 23, 2007.

28                                           LAWRENCE K. KARLTON
                                             SENIOR JUDGE
                                             UNITED STATES DISTRICT COURT

Settlement Agreement & Consent Decree                        Case No. CIV. S-02-0442 LKK DAD

1   SettlementAgreement.wpd

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Settlement Agreement & Consent Decree                                   Case No. CIV. S-02-0442 LKK DAD